UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
BRIAN O'SHEA and MICHAEL O'SHEA, )
in his personal capacity, on his )
own behalf as Plan Beneficiary,  )
and on behalf of other Plan      )
Beneficiaries MEGHAN O'SHEA, JOHN )
O'SHEA, and COLLEEN O'SHEA,      )
                                )
              Plaintiffs,        )
                                )        CIVIL ACTION
          v.                     )        NO. 14-10377-WGY
                                )
UPS RETIREMENT PLAN, UNITED      )
PARCEL SERVICE OF AMERICA, INC., )
UPS RETIREMENT PLAN ADMINISTRATIVE )
COMMITTEE, and DOE DEFENDANTS    )
1, 2, and 3,                     )
                                )
              Defendants.        )
_____ )
```

FINDINGS OF FACT AND RULINGS OF LAW

YOUNG, D.J.                                    July 10, 2015

## I.   INTRODUCTION

Brian O'Shea ("O'Shea") worked as an employee of the United

Parcel Service ("UPS") for nearly four decades.  After falling

ill, he elected to retire and chose a retirement plan that would

guarantee monthly payments to his children for ten years.

Although he stopped working on January 8, 2010, he was to remain

an active employee of UPS until February 28 due to his accrual

of vacation days.  Unfortunately, O'Shea died on February 21,

one week before the date on which his retirement annuity was

slated to start.  Under the terms of UPS's retirement plan (the "Plan"), the committee in charge of pension decisions denied O'Shea's children any retirement benefit payments on the ground that O'Shea was not actually retired at the time of his death. Following an internal appeal, O'Shea's son Michael (the "Plaintiff") now sues UPS, the UPS Retirement Plan, the UPS Retirement Plan Administrative Committee (the "Committee"), and three unnamed individuals (collectively, the "Defendants") in his personal capacity and as executor of O'Shea's estate, alleging violations of the Employee Retirement Income Security Act ("ERISA").  The parties agreed to resolve the suit at a case stated hearing.[1]

This case began when the Plaintiff filed his complaint before this Court on February 20, 2014.  Compl., ECF No. 1.  The Defendants moved to dismiss Count II of the complaint (regarding an alleged breach of fiduciary duty) with prejudice on May 27, 2014.  Mot. Dismiss Count II Compl. With Prejudice, ECF No. 12; Defs.' Mem. Supp. Mot. Dismiss Count II Compl. With Prejudice, ECF No. 13.  The Defendants also filed their answers to the

---

[1] A case stated hearing is a procedure that allows the Court to make a judgment based on the record in cases where there are minimal factual disputes.  In its review of the record, the Court is entitled to "engage in a certain amount of factfinding, including the drawing of inferences."  TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)) (internal quotation marks omitted).

complaint that same day.  Answer Defs. UPS Retirement Plan & UPS Retirement Plan Admin. Committee, ECF No. 14; Answer Def. United Parcel Service Am., Inc., ECF No. 15.  The Plaintiff filed a memorandum in opposition to the motion to dismiss on July 1, Pl.'s Opp'n Defs.' Mot. Dismiss Count II Compl., ECF No. 20; the Defendants replied on July 11, Defs.' Reply Mem. Supp. Their Mot. Dismiss Count II With Prejudice, ECF No. 23; and the Plaintiff filed a sur-reply on July 28, Pls.' Sur-Reply Defs.' Mot. Dismiss, ECF No. 27.  On July 31, 2014, this Court heard oral argument and granted the Defendants' motion to dismiss Count II.  Elec. Clerk's Notes, July 31, 2014, ECF No. 31.

At that same hearing, the parties agreed to have Count I of the complaint - a claim for benefits under ERISA - resolved at a case stated hearing.  Tr. 9:14-11:4, ECF No. 32; see also Joint Mot., ECF No. 36; Consent Parties, ECF No. 41.  On November 6, 2014, the Defendants filed with this Court copies of the Plan, Notice Filing Plan Related Docs. Def. UPS Retirement Plan, Ex. A, UPS Retirement Plan ("UPS Plan"), ECF No. 39-1;[2] the Summary

---

[2] Most likely due to its length, the Plan is filed on the docket in six parts: pages 1-62 are at ECF No. 39-1; pages 63-122 are at ECF No. 39-2; pages 123-188 are at ECF No. 39-3; pages 189-238 are at ECF No. 39-4; pages 239-296 are at ECF No. 39-5; and pages 297-340 are at ECF No. 39-6.  Additionally, the Plan consists of several separately paginated documents that have been submitted together.  To facilitate reference to the Plan, this opinion cites to the Bates stamp number at the bottom of each page, as this avoids confusion.

Plan Description (the "Summary"), Notice Filing Plan Related

Docs. Def. UPS Retirement Plan, Ex. B, UPS Retirement Plan

Summary Plan Description ("UPS Summary"), ECF No. 39-7; and the

administrative record of the Plaintiff's initial claim and the

internal appeal of that claim's denial, Admin. Claim File ("UPS

Admin. R."), ECF No. 40.[3]  The Plaintiff filed a motion for

judgment as a case stated, a memorandum in support of this

motion, and a statement of material facts on December 5, 2014.

Pls.' Mot. J. Case Stated, ECF No. 43; Pls.' Mem. Supp. Mot. J.

Case Stated ("Pl.'s Mem."), ECF No. 44; Pls.' Statement

Undisputed Material Facts Supp. Case Stated Mem. ("Pl.'s

Facts"), ECF No. 45.  The same day, the Defendants filed a

motion for judgment and an accompanying memorandum in support.

Mot. J. Count I Compl., ECF No. 46; Defs.' Mem. Supp. Mot. J.

("Defs.' Mem."), ECF No. 47.  On December 19, each side filed a

response in opposition to the other side's motion.  Pls.' Opp'n

Defs.' Mot. J. ("Pl.'s Opp'n"), ECF No. 48; Defs.' Resp. Opp'n

Pls.' Mot. J. ("Defs.' Opp'n"), ECF No. 49.  The Defendants also

filed a response to the Plaintiff's statement of undisputed

material facts.  Defs.' Conditional Resp. Pl.'s Statement

Undisputed Material Facts Supp. Case Stated Mem. ("Defs.'

---

[3] This record was filed under seal and does not appear in
electronic form on the docket; a hard copy was delivered to the
Court.

Facts"), ECF No. 51.   The case stated hearing took place on
January 8, 2015.   Elec. Notice Hr'g, ECF No. 54.

## II.   FINDINGS OF FACT

### A.   Terms of the Plan

For the sake of convenience, all the relevant terms (and
portions thereof) of the Plan that are discussed in this
memorandum are reproduced here.   The two most salient provisions
are in bold.

> Section 4.1 - <u>Application for Benefits</u>.   Each
> Participant shall make written application to the
> Committee, or its designated representative, for
> Retirement Benefits, other than a Disability Benefit,
> under this Plan at least sixty (60) days, but not more
> than ninety (90) days, prior to the first day of the
> month on which the benefits applied for are to be
> paid, on a form or forms to be provided by the
> Committee for this purpose.
>
> Section 4.3 - <u>Early Retirement Benefit for Final
> Average Compensation Formula and Pre-2006 Motor Cargo
> Formula</u>.   A Participant who attains his Early
> Retirement Date while in the active employ of an
> Employer Company and all Related Employers, and who
> retires at any time thereafter and prior to his Normal
> Retirement Date, may elect to receive an Early
> Retirement Benefit in an amount determined under
> Section 5.2(b), commencing on the first day of any
> month coincident with or immediately following his
> termination of employment with an Employer Company and
> all Related Employers, provided he has complied with
> the application provisions of Section 4.1.
>
> Section 5.2(b)(ii) - <u>Early Commencement</u>.   A
> Participant who is eligible for an Early Retirement
> Benefit under [the preceding subsection] may commence
> such benefit at any time on or after he terminates
> employment with all Employer Companies and Related
> Employers and before his Normal Retirement Date
> provided that the amount of such benefit shall be

[5]

reduced for early commencement in accordance with [numerous guidelines].

Section 5.4 - Benefit Payment.
(b) Election out of Normal Form of Benefit or Qualified Joint and Survivor Annuity.  In lieu of the Normal Form or the Qualified Joint and Survivor Annuity, a Participant who is eligible for an annuity form of benefit, may elect, at any time within the 90-day period ending on the Annuity Starting Date, to waive the Normal Form or the Qualified Joint and Survivor Annuity in favor of one of the Actuarial Equivalent Optional Forms of Benefit described below.
**(d)(iii) Single Life Annuity with 120-Month Guarantee. Under the Single Life Annuity with 120-Month Guarantee, a reduced monthly benefit shall be paid to the Participant for his lifetime, with a guarantee of 120 monthly payments.  If the Participant dies after the Annuity Starting Date but before receiving 120 monthly payments, the monthly payments shall be paid to the Participant's Beneficiary, until the Participant and his Beneficiary have received a total of 120 monthly payments.**

**Section 5.6 - Preretirement Survivor Annuity.**
**(a) Final Average Compensation Formula or Pre-2006 Motor Cargo Formula.  If a vested Participant dies prior to his Annuity Starting Date, his Spouse or Domestic Partner will be entitled to receive a Preretirement Survivor Annuity for that portion of his benefit attributable to the Final Average Compensation Formula and Pre-2006 Motor Cargo Formula commencing:**

**(i) if the Participant dies after attaining his Earliest Commencement Age, as of the first day of the month coincident with or next following the date of the Participant's death; and**

**(ii) if the Participant dies on or before attaining his Earliest Commencement Age, as of the first day of the month coincident with or next following the date the Participant would have attained his Earliest Commencement Age[.]**
(b) Amount of Preretirement Survivor Annuity for Final Average Compensation Formula or Pre-2006 Motor Cargo Formula.  The Preretirement Survivor Annuity to which the Participant's surviving Spouse or Domestic Partner shall be entitled hereunder shall be equal to, for a surviving Spouse, the amount which would have been

payable to the Participant's Spouse under the
Qualified Joint and Survivor Annuity or, for a
Domestic Partner, the Joint and 50% Survivor
Annuity[.]

Section 9.3 - <u>Power to Establish Regulations</u>.  The
Committee shall establish rules and regulations for
the administration of the Plan and the Committee.
Except as otherwise herein expressly provided, the
Committee shall have the exclusive right to interpret
the Plan and decide any matters arising in the
administration and operation of the Plan, and any
interpretations or decisions so made shall be
conclusive and binding on all persons; provided,
however, that all such interpretations and decisions
shall be applied in a uniform manner to all Employees
and Participants similarly situated.

UPS Plan 38, 44, 60, 62, 64, 82.  There are also three relevant

provisions in the Summary:

<u>Single Life Annuity With 120-Month Guarantee</u>

The Single Life Annuity with 120-Month Guarantee pays
you a reduced monthly benefit for your life with a
guarantee of payments for a period of 10 years.  If
you die before the 10-year guarantee period ends, your
beneficiary continues to receive the same benefit
amount for the remainder of the guarantee period.  If
you live beyond the guarantee period, you continue to
receive payments for your lifetime.  However, since
you outlived the guarantee period, your beneficiary
will not receive a benefit after your death.

<u>If You Die Before You Retire</u>

If you die after you become vested in your Plan
benefit but before your retirement benefit begins,
your surviving spouse or surviving Domestic Partner
(determined as of the date of your death) may receive
a monthly benefit from the Plan.

Your spouse or Domestic Partner will be eligible to
receive 50% of the benefit you were entitled to
receive under the Qualified Joint and Survivor Annuity
(Joint and 50% Survivor Annuity for a Domestic

[7]

Partner) as if you had terminated your employment on
the date of your death or actual termination, if
earlier.  Your spouse's or Domestic Partner's benefit
will be based on the Benefit Service credit you've
earned as of your date of death.

. . .

<u>If You Die After You Retire</u>

Remember, if you die after your monthly retirement
benefits have started, benefits will be paid to your
surviving spouse, surviving Domestic Partner or other
beneficiary only if the payment form you elected
provides for such benefits.

UPS Summary 20, 22.

**B.   O'Shea's Retirement and UPS's Benefits Decision**

O'Shea was an employee of UPS - and accordingly was a

participant in the Plan - for thirty-seven years prior to his

death.  Pl.'s Facts ¶ 4.  In 2008, he was diagnosed with cancer;

he continued to work during this time, using vacation days when

he had to miss work for treatment.  <u>Id.</u> ¶ 6.  He reached age

fifty-five on August 25, 2009, thus allowing him to choose to

retire early (though he did not do so at that time).  <u>Id.</u> ¶ 4.

By December 2009, he decided to elect retirement and met with

Amy Madeira ("Madeira"), a human resources supervisor at UPS,

for help in filling out his retirement forms and receiving

benefits.  <u>Id.</u> ¶¶ 7, 9.  O'Shea had accumulated seven weeks of

vacation time and personal days by that point, and after

discussing the matter with Madeira, he opted to use up those

days before formally retiring in order to maximize the amount of

[ 8 ]

time during which he would receive full pay and benefits.  Id. ¶
8; Defs.' Facts ¶ 7.  UPS represents that it was common practice
for employees with O'Shea's length of service to retire at the
end of February in order to maximize compensation.  UPS Admin.
R. 10.  Madeira did not learn during this discussion that
O'Shea's cancer had become terminal.  Defs.' Facts ¶ 8; UPS
Admin. R. 10.

O'Shea submitted his retirement papers on January 7, 2010,
which was also the last day he actually worked.  Pls.' Facts ¶
10; Pl.'s Mem. 2-3.  In those papers, he named his "date of
retirement" as February 28, 2010, and his "benefit start date"
as March 1, 2010.  UPS Admin. R. 86.  O'Shea chose as his
payment option the "Single Life Certain Annuity with 10-Year
Payment Guarantee."  UPS Admin. R. 87.  Under the terms of the
Plan, a retired employee who opts for this benefit receives
lifetime monthly payments; if he dies after his Annuity Starting
Date but before he has received 120 monthly payments, the
remainder of those 120 payments will be sent to his designated
beneficiaries.  UPS Plan 62.  In relevant part, O'Shea's
retirement forms described this benefit as follows: ". . . I
will receive a monthly benefit for my lifetime with a guarantee
of monthly payments for a period of 10 years.  If I die within
the 10-year guarantee period, my beneficiary will continue to
receive my monthly benefit amount for the remainder of the

guarantee period." UPS Admin. R. 87. O'Shea named his four children as the beneficiaries. Defs.' Mem. 6. At the end of the retirement form, O'Shea signed his name to a statement "acknowledg[ing] that [he] ha[s] read this form entirely." UPS Admin. R. 95.

Shortly after submitting his retirement forms, O'Shea also independently accepted UPS's Special Restructuring Program ("SRP"), which involved UPS giving select employees one year's worth of compensation in exchange for their leaving the company and executing a release of claims. Defs.' Mem. 6-7. O'Shea's SRP forms, which were submitted on February 12, 2010, acknowledged a separation date from the company of February 28, 2010 - the same day as the date of retirement specified in his retirement forms. UPS Admin. R. 75, 76. In the general release, which was executed the same day he submitted the SRP form, O'Shea acknowledged that he was "releasing (i.e., giving up) all known and unknown claims, promises, causes of action, or similar rights of any type that I may presently have . . . against any Released Party . . . [including] claims I might have under . . . the Employee Retirement Income Security Act of 1974 (ERISA)." Id. at 81-82. In return for opting into the SRP, O'Shea received a one-time payment of $98,800 minus applicable withholding and taxes. Id. at 76.

[10]

On February 21, 2010 - one week before his official
retirement and annuity starting date - O'Shea succumbed to his
illness.  Pl.'s Mem. 3.  Upon learning of his death, UPS
cancelled the payment it had issued for the Annuity Starting
Date of March 1.  UPS Admin. R. 96.  The Committee sent the
Plaintiff a letter on March 23, 2010, telling him that it was
denying any benefits under the Plan.  Id. at 39; Pl.'s Facts ¶
43.  On April 23, 2010, the Plaintiff filed an appeal seeking
the 120 monthly payments O'Shea was purportedly guaranteed under
the Plan, and the Committee denied said appeal on June 1.  UPS
Admin. R. 22-23, 37-38; Pl.'s Facts ¶¶ 44-45.  The Plaintiff
filed a second appeal on July 27 and submitted additional
information through counsel on August 24; this second appeal was
denied on October 1, 2010.  UPS Admin. R. 8-11, 16-20; Pl.'s
Facts ¶¶ 46-48.

The Plaintiff's second appeal focused on three related
points.  First, the appeal noted that when helping O'Shea fill
out his retirement packet, Madeira never informed him that his
designees would not receive the retirement benefit if O'Shea
died before his formal retirement date.  UPS Admin. R. 16-17.
Second, the Plaintiff argued that Madeira encouraged O'Shea to
delay his retirement date.  Id.  Third, the Plaintiff (both in
his appeal letter and in a subsequent letter from his counsel
containing additional information) emphasized language from the

[11]

Plan stating that the payments he was seeking were "guaranteed."

Id. at 17-20.

In its October 1 letter denying the Plaintiff's appeal, the
Committee cited Section 5.6(a) of the Plan as a reason for the
denial of benefits:

> Mr. O'Shea passed away as an active UPS employee on
> February 21, 2010.  Because Mr. O'Shea passed away
> prior to his Annuity Starting Date of March 1, 2010,
> his retirement benefit becomes payable as a
> Preretirement Survivor Annuity.  According to Section
> 5.6(a) of the Plan, "if a vested Participant dies
> prior to his Annuity Starting Date, his Spouse or
> Domestic Partner will be entitled to receive a
> Preretirement Survivor Annuity for that portion of his
> benefit attributable to the Final Average Compensation
> Formula." . . . Because Mr. O'Shea was not married at
> the time of death, there are currently no
> Preretirement Survivor Annuity benefits payable from
> the Plan.

Id. at 8-9.[4]  The Committee also included language from Section
5.6(b) addressing the amount a spouse would be due under the
Preretirement Survivor Annuity.  Id.  Responding to the

---

[4] Following the Committee's denial of benefits to the
Plaintiff and his siblings, O'Shea's ex-wife petitioned the
Committee for Preretirement Survivor Annuity benefits under this
section of the Plan.  Defs.' Mem. 7-8.  After she provided an
executed Qualified Domestic Relations Order - an order under
state law providing an ex-spouse with a portion of a pension
benefit - the ex-wife began receiving monthly payments.  Id. at
8 & n.42.  Because the only impact of the ex-wife's claim is
ministerial (in the sense that, were the Plaintiff to prevail in
this Court, UPS and the Committee would simply need to calculate
her share of the Single Life Certain Annuity with 10-Year
Payment Guarantee benefit and distribute payments accordingly),
Pl.'s Mem. 19, there is no need to address her role more
directly in this opinion.

Plaintiff's arguments regarding the word "guarantee," the
Committee also cited language from O'Shea's retirement benefit
application describing the Single Life Certain Annuity with 10-
Year Payment Guarantee, which stated that "[i]f [the employee]
die[s] within the 10-year guarantee period, [his] beneficiary
will continue to receive [his] monthly benefit amount for the
remainder of the guarantee period." Id. at 10 (emphasis in
original).  The Committee found that the highlighted language
made clear that "[t]he payments are not guaranteed until they
have commenced." Id.  The letter also noted that Madeira, in
her role as a human resources specialist, would not have
discussed with O'Shea the ramifications for his retirement
benefits should he pass away before the Annuity Starting Date;
it also stressed that she had no way of knowing he was terminal
and that her recommendation of using up vacation days before
formal retirement was customary.  Id.  Lastly, the Committee
noted that the gap between O'Shea's becoming eligible for
retirement and the date on which he actually requested his
retirement application (August and December of 2009,
respectively) strongly suggested that Madeira had not done
anything to convince O'Shea to delay his retirement date beyond
late 2009.  Id.  After expressing sympathy, the Committee
alerted the Plaintiff that he was entitled to challenge its
final decision in federal court.  Id. at 11.

[13]

## III. RULINGS OF LAW

### A.   Deference Due to the Committee

As a threshold matter, the Defendants note that their decision denying benefits should be reviewed under the arbitrary and capricious standard.  Defs.' Mem. 11-12.  They hinge this argument on language from Section 9.3 of the Plan granting the Committee "the 'exclusive right to interpret the Plan'" and stating that "any interpretations or decisions by the Committee are 'conclusive and binding.'"  Id. at 12.  Their brief then cites numerous cases in which the First Circuit ruled that very similar language in other retirement plans meant that the decisions of the committees overseeing those plans would be reviewed under the arbitrary and capricious standard.  Id. at 12-13 (citing Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002) (applying arbitrary and capricious standard when the plan in question included the phrases "exclusive right . . . to interpret the Plan" and "conclusive and binding")); Twomey v. Delta Airlines Pilots Pension Plan, 328 F.3d 27, 31 (1st Cir. 2003) (similar); Reeder v. Sun Life Assurance Co. of Can., Inc., 497 F. Supp. 2d 125, 127-28 (D. Mass. 2007) (Zobel, J.) (noting that a plan requiring that a claimant's proof be "satisfactory" to the administrator gave the administrator sufficient deference to trigger the arbitrary and capricious standard).  If this standard applies, the Defendants argue, this Court must uphold

[14]

the Committee's decision so long as that decision is "plausible in light of the record as a whole."  Defs.' Mem. 13-14 (quoting Twomey, 328 F.3d at 31) (internal quotation marks omitted). This means that "[t]he Committee's decision does not have to be right; instead, the arbitrary and capricious standard simply asks whether the Committee's determination was reasonable."  Id. at 14 (collecting D. Mass. cases) (internal quotation marks omitted).

The Plaintiff does not appear to challenge this argument. Nowhere in his opening memorandum does he address the issue of the standard governing this Court's review of the Committee's decision.  See Pl.'s Mem.  Indeed, the Plaintiff's opposition to the Defendants' initial memorandum frames its argument around the arbitrary and capricious standard, e.g., Pl.'s Opp'n 2, 13, 14 - though because any decision so unreasonable as to be deemed arbitrary and capricious would also necessarily fail under a less deferential standard of review as well, this does not constitute a direct concession that the arbitrary and capricious standard is the correct one to apply.

Ultimately, the Defendants are correct regarding the standard the Court must apply.  Accordingly, the Court will analyze the Committee's decision using the deferential standard mandated by law.

### B.   Language of the Plan

The bulk of the parties' arguments centers around the text of the Plan itself and the relationship between Section 5.6 (the section stating that the spouse or domestic partner of someone who dies before their Annuity Starting Date may receive a Preretirement Annuity) and the remainder of the Plan, particularly Section 5.4 (which describes the retirement annuity option chosen by O'Shea).  Given the intricacy of the parties' arguments (and the fact that the Plaintiff's arguments are not a model of clarity), the arguments are broken down separately before the Court analyzes the terms of the Plan.

### 1.   Plaintiff's Arguments

### a.   Section 5.6 Viewed Alone

The first part of the Plaintiff's argument regarding the text of the Plan focuses exclusively on the language of Section 5.6.  He first claims that the Committee relied exclusively on Section 5.6 in rendering its denial, Pl.'s Mem. 5, and further argues that because ERISA requires plan administrators clearly to refer to plan provisions on which benefits decisions are based, the Committee's decision can only be supported by Section 5.6 and not by other parts of the Plan, id. at 7 (citing 29 C.F.R. § 2560.503-1(j); Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113, 128-32 (1st Cir. 2004); Tebo v. Sedgwick Claims Mgmt.

<u>Servs., Inc.</u>, 848 F. Supp. 2d 39, 55 (D. Mass. 2012) (Saylor, J.)).

Examining Section 5.6, the Plaintiff notes that it does not refer in any way to the Single Life Annuity with 120-Month Guarantee retirement benefit as chosen by O'Shea, nor does it explicitly address situations in which a Plan participant elects retirement but dies before the first payment is issued; instead, it solely discusses the Preretirement Survivor Annuity.  <u>Id.</u> at 5.  He argues that the law mandated this provision's inclusion in the Plan because Congress was concerned about situations in which a surviving spouse was left destitute "simply because an employee entitled to a pension dies before electing retirement and triggering his retirement benefits"; because that factual circumstance does not inure here (considering that O'Shea had no spouse and had already elected his benefits), it was inappropriate for the Committee to rely on Section 5.6 to deny benefits to O'Shea's designees.  <u>See id.</u> at 5-6.  The Plaintiff further contends that Subsections 5.6(a)(i) and (ii) - two subsections concerning the timing of benefits that the Committee did not include in its decision - demonstrate that Section 5.6 as a whole is concerned with a participant reaching "earliest retirement age" rather than addressing the specific circumstances of O'Shea's election of retirement and subsequent death.  <u>Id.</u> at 6-7.

[17]

### b.   Plan Viewed As a Whole

After purporting to demonstrate why Section 5.6 viewed alone does not bar his receiving benefits, the Plaintiff then seeks to show that other provisions of the Plan address the circumstances of O'Shea's near-retirement and death and mandate that the Plaintiff receive payments.  First, he cites Sections 4.1 and 4.3 of the Plan to show that the Plan requires a two-month gap between election of benefits and the Annuity Starting Date; he further cites Section 5.2(b)'s provision for early retirement benefits "commenc[ing] . . . at any time on or after [an employee] terminates employment" as consistent with this gap.  Id. at 8-9.  He then notes that despite mandating this gap between election and receipt of benefits, none of these three sections "state[] that the retirement benefit chosen by the participant is forfeited if the participant then dies during that gap in time."  Id. at 9.

Next, the Plaintiff looks at Section 5.4, which describes the forms of retirement benefits - including the Single Life Certain Annuity with 10-Year Payment Guarantee selected by O'Shea.  First, he observes that Section 5.4(b)'s requirement that an election be made within the three months preceding the Annuity Starting Date is consistent with the gap between election and receipt of benefits contemplated by Sections 4.1, 4.3, and 5.2, and states that this provision does not address

the death of a participant during that gap.  Id. at 9-10.  The

Plaintiff then turns to Section 5.4(d), which describes the

Single Life Certain Annuity with 10-Year Payment Guarantee.

Given the critical nature of this provision, the Plaintiff's

argument is copied verbatim below:

> [Section 5.4(d)] expressly states that "a reduced
> monthly benefit shall be paid to the Participant for
> his lifetime, with a guarantee of 120 monthly
> payments."  It never qualifies the guarantee by
> stating that the 120 payments will not be made if the
> participant dies after electing this form of benefit
> and submitting the necessary retirement papers to UPS,
> but before the first annuity payment is made.  It does
> state that if the participant dies after the "Annuity
> Starting Date," defined in the Plan as the first date
> of payment under the selected annuity, all remaining
> payments "shall be paid to the Participant's
> Beneficiary, until the Participant and his Beneficiary
> have received a total of 120 monthly payments."  Thus,
> the only time the Plan even references the effect of
> the participant's death on the guarantee of 120
> monthly payments is to state that the payments to the
> participant and the beneficiaries will still total
> 120.
>      The Plan makes no reference at all to death
> before the Annuity Starting Date, and never states
> that the 120 monthly payments will not be made under
> those circumstances.  It would not be logical for the
> Plan to contain any such provision, because the Plan
> is specifically written to require the participant to
> elect this annuity option and to thereafter wait for
> months to receive a first payment.  Under those
> circumstances, the only reasonable interpretation of
> all of the Plan terms, read together, is that a
> participant's death after electing retirement and
> submitting the retirement paperwork to UPS while
> waiting for the first annuity payment has no effect on
> the Plan's guarantee of 120 total payments to either
> the participant or the participant and his
> beneficiaries.  Any other reading would require the
> Plan to be interpreted as requiring a minimum of a two
> month waiting period to receive the annuity payment

> while, only by inference, reading into the Plan an
> unexpressed forfeiture provision, by which that
> benefit can be lost, merely by the vagaries of the
> timing of the hand of death, during the course of the
> waiting period mandated by the Plan.  Such a reading
> is illogical, inconsistent with the express terms and
> structure of the Plan, and cannot be upheld under
> those circumstances.

Id. at 10-11 (internal citations omitted).  The Plaintiff goes

on to make similar arguments regarding the description of the

Single Life Certain Annuity with 10-Year Payment Guarantee in

O'Shea's retirement benefit application - discussed above in the

fact section - focusing on the word "guarantee" and the failure

to directly address death prior to the first annuity payment.

Id. at 11-12.  Put succinctly, the Plaintiff's reading of the

Plan as a whole is as follows:

> (1) [A] participant elects to retire under Section 4.1
> (which contains no exclusion for death before first
> retirement payment); (2) is then entitled to choose
> any of the annuities available under Section 5.4
> (which also contains no exclusion for death before
> first retirement payment) . . . ; (3) and the payments
> then commence; with (4) Section 5.6 adding the
> statutory requirement of a preretirement survivor
> annuity but without stating that it supplants any
> other retirement benefit already elected by a
> participant or to which he or his beneficiaries are
> entitled.

Pl.'s Opp'n 10.

### c.  Additional Arguments Regarding Construction

In addition to the broader arguments regarding

interpretation of Section 5.6 and the Plan as a whole, the

Plaintiff offers several additional points regarding

construction of the Plan; some deal with general rules, while others deal with the meaning of particular relevant terms.

### i.   Lack of Clarity

In the event that the Court does not accept the Plaintiff's argument that the Plan clearly mandates the payment of benefits, he also argues that contract principles compel the Court to construe any lack of clarity in his favor.  The lack of clarity he focuses on arises from the Plan's failure explicitly to say what happens to someone who has elected the Single Life Certain Annuity with 10-Year Payment Guarantee but dies before the Annuity Starting Date.  Pl.'s Mem. 13-15.  In the face of such ambiguity, he says, the Court should look to extrinsic evidence of the intent of the parties to determine the meaning of relevant contract terms.  Id. at 13 (citing Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995)).

As to O'Shea's understanding, the Plaintiff contends that "[n]o reasonable interpretation of the circumstances presented by this case could allow for the possibility that Mr. O'Shea interpreted the Plan terms at issue here to call for the termination of . . . payments if . . . he passed away before the payments began." Id. at 14.  Turning to evidence of the Defendants' intent, the Plaintiff looks at the wording of the Summary, focusing on the word "guarantee" and language providing

that payments continue if a participant "die[s] before the 10-year guarantee ends." Id. Because ERISA requires all material terms to be included in the Summary, the Summary's failure to state that an elected benefit could be lost due to death before the Annuity Starting Date is "powerful evidence that [the Defendants] never actually intended the Plan to include such a limitation." Id. at 15; see also Pl.'s Opp'n 14-17. The Plaintiff makes a virtually identical argument based on the description of the Single Life Certain Annuity with 10-Year Payment Guarantee in O'Shea's retirement application as well. See Pl.'s Mem. 15-16. He also contends that UPS's standard practice of having employees use up vacation days before formally retiring "clearly reflects a belief on the part of the Defendants that under the Plan's terms retirement benefits, once elected, could not be forfeited by events occurring before the annuity payments commenced." Id. at 18.

In his memorandum in opposition to the Defendants' motion for judgment, the Plaintiff highlights one additional piece of extrinsic evidence of the Defendants' intent: the subsequent amendment of the Plan. Made effective starting on December 18, 2012 (nearly three years after O'Shea's death), the amendment allows survivors of a deceased employee to receive that person's chosen benefits if the decedent dies between the filing of his retirement application and the Annuity Starting Date. Defs.'

Mem. 14 n.65; UPS Plan 289-90.  Given that the pre-amendment
Plan did not explicitly state what happened when an employee
died between his election of benefits and the Annuity Starting
Date, the Plaintiff argues that "the Defendants always intended
the Plan to allow payment of the annuity in these circumstances,
and that the amendment was added to clear up any ambiguity that
might exist in the Plan by making that explicit."  Pl.'s Opp'n
14.  The amendment would thus constitute extrinsic evidence of
the Defendants' intent in forming the Plan as it existed at the
time of O'Shea's death.  Id.

### ii.  Requirements for Exclusions

In his opposition to the Defendants' motion for judgment,
the Plaintiff argues for the first time that First Circuit
precedent regarding retirement plan exclusions compels a ruling
in his favor.  Specifically, he points to this Court's decisions
in Colby v. Assurant Employee Benefits, 603 F. Supp. 2d 223 (D.
Mass. 2009) and 818 F. Supp. 2d 365 (D. Mass. 2011), and the
First Circuit's affirming opinion in Colby v. Union Security
Insurance Co. & Management Co. for Merrimack Anesthesia
Associates Long Term Disability Plan, 705 F.3d 58 (1st Cir.
2013).  That case centered on a physician recovering from
substance abuse who contended that her risk of relapsing
constituted a current disability under her employer's long-term
disability plan.  Colby, 705 F.3d at 59-60.  The employer,

meanwhile, argued that a risk of relapse was speculative and by definition could only take place in the future, thus running counter to the word "current."  <u>Id.</u> at 61.  Noting that the plan in question was silent as to whether a future risk could be considered a present disability, the First Circuit emphasized (1) that "ERISA plan[s] must be read in a natural, commonsense way," and (2) that exclusions from coverage are disfavored and must be "spell[ed] out . . . distinctly."  <u>Id.</u> at 65-66. Ultimately, the First Circuit narrowly held that, considering the lack of any explicit inclusion of risk of relapse in the plan,the administrator of the plan "acted arbitrarily and capriciously in refusing to consider whether the plaintiff's risk of relapse swelled to the level of a disability.  A benefits determination cannot be 'reasoned' when the plan administrator sidesteps the central inquiry."  <u>Id.</u> at 67.

The Plaintiff now looks to the First Circuit's statement that exclusions must be spelled out distinctly for support for his claim, arguing that the failure of the Plan in this case to explicitly set forth what happens when someone dies between the election and receipt of their chosen retirement benefits means that the Plan cannot be read to compel the denial of benefits in these circumstances.  <u>See</u> Pl.'s Opp'n 4-5.  Because Section 5.6 (the only section of the Plan directly to address death before the Annuity Starting Date) is a narrowly tailored provision

designed to address Congress's concerns regarding the
Preretirement Survivor Annuity and not the Single Life Annuity
with 120-Month Guarantee, he says, under Colby the Defendants
cannot invent linkages to other parts of the Plan in an attempt
to show that Section 5.6 bars receipt of other kinds of
benefits.  See id. at 5-10.

### iii. Meaning of "Annuity Starting Date"

Another argument the Plaintiff raises for the first time in
his opposition memorandum relates to the meaning given by the
Defendants to the term "Annuity Starting Date."  This argument
is strongly related to the purposivist reading of Section 5.6
discussed above.  Here, the Plaintiff argues that the term
"Annuity Starting Date" was only used in the Plan to comply with
a statutory provision meant to cover preretirement survivor
annuities; he contends that the Defendants' "current claim that
the term has impact in other circumstances, such as the present
matter, is a post hoc rationalization for their" denial of
benefits.  Id. at 11-12.  Expanding on this claim, he argues
that the use and meaning of "Annuity Starting Date" cannot
"reach over to those sections" of the Plan describing the Single
Life Annuity with 120-Month Guarantee, given the divergent
purposes underlying those different sections.  See id. at 12-13.

### 2.  Defendants' Arguments

[25]

In contrast to the Plaintiff's kitchen sink approach, the
Defendants offer one focused argument: particularly considering
the deferential arbitrary and capricious standard, the
Committee's decision regarding O'Shea's benefits arose from a
reasonable and harmonious reading of various portions of the
Plan.  As they portray it, "[t]he Plan provides for only one
specific benefit in the event that a Participant dies <u>prior</u> to
the Annuity Starting Date: under Section 5.6(a) of the Plan, a
spouse or Domestic Partner will be entitled to receive a
Preretirement Survivor Annuity."  Defs.' Mem. 14 (emphasis in
original).  They cite the subsequent amendment to this part of
the Plan providing payments for those who die between election
and receipt of benefits as proof that the Plan as originally
written did not allow for payment under the circumstances of
O'Shea's death.  <u>Id.</u> at 14 n.65.  Reinforcing the notion that
the Plan as originally written allows only one kind of benefit
when an employee dies before formally retiring, the Defendants
also cite language from Section 5.4 saying that a deceased
employee's survivors receive the balance of the 120 guaranteed
monthly payments "[i]f the Participant dies <u>after</u> the Annuity
Starting Date but before receiving 120 payments."  <u>Id.</u> at 15
(emphasis and alteration in original) (quoting UPS Plan 62).
They further bolster this harmonization of Sections 5.4 and 5.6
by looking to language from O'Shea's retirement application and

the Summary, though they stress that only the text of the Plan itself is relevant.  See id. at 15-17; see also Defs.' Opp'n 15-17 (discussing the Summary and retirement application).

In their memorandum in opposition to the Plaintiff's motion for judgment, the Defendants largely double down on their proffered reading of the Plan: an active employee who dies before the Annuity Starting Date receives only the Preretirement Survivor Annuity, while the survivors of an employee who has selected the Single Life Annuity with 120-Month Guarantee and dies after the Annuity Starting Date will receive the 120 monthly payments provided for by that option.  See Defs.' Opp'n 7, 9, 13.  Moreover, they stress First Circuit precedent commanding plan administrators to construct plan documents strictly, "even when such an approach may appear inequitable with respect to particular Participants or plaintiffs."  Id. at 11-12 (citing Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 490 (1st Cir. 1989)).

The Defendants also address some of the Plaintiff's contentions regarding construction of the Plan.  First, they note that his marshalling of extrinsic evidence of intent to attempt to remedy any perceived lack of clarity "is completely contrary to the arbitrary and capricious standard of review," as that standard only asks whether the Committee's reading was reasonable rather than the best possible option.  Id. at 5.

Because their reading is certainly reasonable, they say, the Plaintiff's argument regarding clarity is irrelevant.

Second, turning to the Plaintiff's contention that the Plan was required explicitly to state that the selected retirement benefit was forfeited if the employee died before reaching the Annuity Starting Date, the Defendants make two arguments.  The first is that what is contemplated is not a forfeiture at all: because O'Shea was eligible to receive either the Preretirement Survivor Annuity or the Single Life Annuity with 120-Month Guarantee depending on his date of death, "the Plan provided a benefit for either qualifying scenario[, and n]o benefits were 'forfeited.'"  Id. at 12-13.  The second is that this proposed reading renders the Annuity Starting Date irrelevant as it appears in Section 5.4 and instead pins the vesting of a benefit to some unnamed, unidentified date.  Because the Plaintiff cannot and does not point to any language in the Plan suggesting that a participant becomes entitled to Single Life Annuity with 120-Month Guarantee payments at any point other than the Annuity Starting Date, the Committee's judgment must be deemed reasonable.  Id. at 13-14.

### 3.   The Court's Construction of the Plan

The Court rules that the Defendants have the better of the argument over the terms of the Plan.  Indeed, their reading of the Plan is not just plausible - which is all that is needed to

survive review under the arbitrary and capricious standard, as discussed above - but also strikes the Court as correct.  In the Court's view, the most important provision of the Plan is the part of Section 5.4 stating that "[i]f the Participant dies after the Annuity Starting Date but before receiving 120 monthly payments, the monthly payments shall be paid to the Participant's Beneficiary."  UPS Plan 62.  Under the Plaintiff's proposed reading of the Plan (which, he claims, is the only reading of the Plan that is reasonable), monthly payments are guaranteed to a participant's beneficiaries even if the participant dies before the Annuity Starting Date - but this reading renders the first clause of this key phrase completely useless.  It would be odd indeed for the architects of the Plan to include a clause discussing a participant's death after the Annuity Starting Date and before the receipt of 120 payments if the balance of the payments would still be due had the participant died before the Annuity Starting Date as well. Rather, the Defendants' view of this provision seems much more reasonable.  The Court views this clause as setting a condition precedent for the guarantee of 120 payments - a condition that O'Shea tragically failed to satisfy.

Similarly reasonable is the Committee's reading of Section 5.6, which provides for payments to a participant's spouse if the participant dies before the Annuity Starting Date.  While

this provision admittedly does not state explicitly that this
spousal payment is the <u>exclusive</u> benefit available when death
occurs before the Annuity Starting Date, it is fairly inferable
from the structure of the provision and the Plan viewed as a
whole.  Moreover, because the arbitrary and capricious standard
requires this Court to defer to a plausible interpretation of
the Plan, the Court is bound to accept the Defendants' proffered
reading.

The Court must also reject the Plaintiff's additional
arguments regarding construction of the Plan.  His suggestion
that any lack of clarity must be resolved in his favor runs
directly counter to the arbitrary and capricious standard, which
requires not that the Plan be clear but merely that the
Defendants' reading of the Plan (even if it is ambiguous) be
reasonable.  Given that the Court has already ruled their
reading correct, this argument regarding clarity must fail.
Similarly, the Plaintiff's purposivist reading of the term
"Annuity Starting Date" carries no water.  Perhaps it is true
that this term was mandated by Congress for the purpose of
addressing factual circumstances different than those in the
case at bar - but that does not really matter.  So long as the
term is clearly defined, which is indeed the case, its origins
have little bearing on how the Court should approach the
Defendants' interpretation of that term.  Lastly, the Court does

not agree with the Plaintiff that Colby compels a finding in his favor.  While that case does state that exclusions from coverage must be spelled out explicitly, what is happening in this case is not really an exclusion from coverage.  Indeed, O'Shea was included within the scope of the Plan - he just did not receive the benefit he wanted.  The logic of Colby thus does not affect the instant case.

The Court does not render this decision with pleasure.  It is undeniably tragic that O'Shea's untimely death means that his children will not receive the benefits that O'Shea worked so hard to earn.  Moreover, the Court gets the impression from the record that the Plaintiff and his siblings genuinely care about honoring their father's service to UPS and sought a fair resolution without rushing to the courthouse.  Regardless of where its sympathies lie, however, this Court is bound to follow the law, and the law compels a ruling for the Defendants.  The Court is pleased to see that the Defendants have amended the Plan in such a way that ensures that a tragedy of this nature will not occur again; it merely regrets that such a change could not have happened in time to help the Plaintiff.

C.    **Considerations Extrinsic to the Plan**

In addition to the debate over the language of the Plan, the parties also address a few extrinsic issues.  The first stems from the statements made by Madeira during her

consultation with O'Shea regarding using up vacation days before

formally retiring - and, relatedly, the absence of statements

regarding the possibility that O'Shea's children would not

receive benefits were he to die before the Annuity Starting

Date.  As discussed above, the Plaintiff only formally relies on

this evidence as extrinsic proof of UPS's intent in designing

the Plan, see Pl.'s Mem. 17-18, though he also peppers his

briefing with references to O'Shea's reliance on Madeira's

comments, see, e.g., id. at 2-3.  The Defendants stress,

however, that O'Shea's meeting with Madeira is wholly irrelevant

to the Committee's interpretation of the Plan's terms - which,

given that this Court has already dismissed the Plaintiff's

claims regarding breach of fiduciary duty, means that Madeira's

statements are irrelevant to the entire question now before the

Court.  Defs.' Opp'n 17-18.  Moreover, they note that the

Committee did review Madeira's comments and found that they were

consistent with its interpretation of the Plan, so even if her

meeting with O'Shea were relevant, it would not change the

outcome of this case.  Id. at 18.  The Defendants are correct on

this point - only the terms of the Plan itself are material to

this case.  Because the Court has already ruled that the terms

of the Plan compel a ruling for the Defendants, it will not

address this point any further.

Second, the Plaintiff raises in his opposition memorandum
the argument that the Committee was a conflicted decisionmaker.
Pl.'s Opp'n 17-19.  Specifically, he observes that "[t]he Plan
is sponsored and funded by UPS . . . and the Plan is
administered by a committee appointed by it."  Id. at 18 (citing
UPS Plan 36, 82).  He then quotes language from this Court's
decision in Colby stating that:

> [W]here an ERISA plan administrator both determines
> whether an employee is eligible for benefits and pays
> benefits out of its own pocket . . . a reviewing court
> should consider that conflict as a factor in
> determining whether the plan administrator has abused
> its discretion in denying benefits . . . .  [W]here a
> conflict of interest exists, any one factor [including
> the conflict of interest] will act as a tiebreaker
> when the other factors are closely balanced . . . .

Id. at 18 (second and third alteration in original) (quoting
Colby, 603 F. Supp. 2d at 236) (internal quotation marks
omitted).  In addition to what he portrays as the inadequacy of
the Committee's interpretation of the Plan, the Plaintiff now
says that the Committee's purportedly conflicted status ought
serve as another nail in the coffin of their decision denying
O'Shea's children benefits.  Id. at 18-19.  Because this matter
was only raised in the opposition memorandum, the Defendants
have not had an opportunity to address this issue.  Ultimately,
even assuming simply for the sake of argument that the Committee
was in fact conflicted, the Court still must reject this
approach to the case.  Whether a decisionmaker such as the

Committee is conflicted serves merely as a tiebreaker in a close case, and this is not a close case.  As described above, the Defendants' reading of the Plan is eminently reasonable, whereas it would be charitable to call the Plaintiff's reading a stretch.  Given that there is no tie to be broken, the Court deems it unnecessary to expound on this point.

## III. CONCLUSION

For these reasons, the Court GRANTS the Defendants' motion for judgment, ECF No. 46, and DENIES the Plaintiff's motion for judgment, ECF No. 43.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE